**In re RYMSBRAN CONTINENTAL CORP., Debtor.**

**RYMSBRAN CONTINENTAL CORP., Plaintiff–Appellee,**

v.

**EUCLID HALL HOUSING DEVELOPMENT FUND COMPANY, INC. and West Side Federation for Senior Housing, Inc., Defendants–Appellants.**

No. 94–CV–5648 (JS).

United States District Court, E.D. New York.

Jan. 18, 1995.

Berkman, Henoch, Peterson & Peddy by Ronald M. Terenzi, Garden City, NY, for plaintiff-appellee.

Paul, Weiss, Rifkind, Wharton & Garrison by Alan W. Kornberg and Stephen J. Shimshak, New York City, for defendants-appellants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

Before the Court on appeal from the United States Bankruptcy Court for the Eastern District of New York is a default judgment entered on October 28, 1994 in the amount of $500,000 against West Side Federation for Senior Housing, Inc. ("West Side") and its wholly owned subsidiary, Euclid Hall Housing Development Fund Company, Inc. ("Euclid" and, together with West Side, the "Appellants"). Both organizations are not-for-profit corporations formed for the purpose of developing and managing low income housing in New York City. Euclid and West Side assert in this appeal that Bankruptcy Judge Marvin Holland abused his discretionary authority in granting a default judgment against them when their counsel, Steven A. Seklir, failed to attend a pretrial conference and they failed to comply with a discovery demand. Euclid and West Side further argue that even were the entering of default appropriate, the Bankruptcy Court should not have denied their motion to vacate the default judgment. Appellee Rymsbran Continental Corporation ("Rymsbran"), a New York corporation which owns and operates real estate in New York City and which is currently in Chapter 11 bankruptcy proceedings,[1] maintains, on the other hand, that the Bankruptcy Court's rulings were within that court's discretion and should be upheld. Having reviewed the parties' submissions to the Court and the record from the bankruptcy proceedings below, the Court finds that the Bankruptcy Court's decision not to vacate the default entry constituted an abuse of discretion.

## BACKGROUND

The default judgment at issue arose in connection with a suit commenced by Rymsbran against Appellants in Bankruptcy Court on March 4, 1994. In the suit, Rymsbran alleges that Appellants, in renovating a property known as the Euclid Hall Hotel, located at 2345 Broadway in New York City, had damaged commercial space leased to Rymsbran and had maintained scaffolding in violation of a lease agreement dated April 24, 1990 and entitled "999 Year Lease and Grant of Term of Years" (the "Lease").

Using funds borrowed from the City of New York, Euclid had purchased the Euclid Hall Hotel from Rymsbran on April 24, 1990 for $8 million and commenced renovations intending to transform the residential portion of the building into single room occupancy units. The renovations, now expected to cost $15 million, were funded by loans from the City of New York under its SRO Loan Program. The housing was intended to alleviate some of the housing needs of New York City's poor and homeless populations. As a side benefit, the facade of the building, located in the midst of New York City's Upper West Side, was to be restored to its original beauty.

Contemporaneously with the transfer of the Euclid Hall Hotel from Rymsbran to Euclid, the commercial space located on the first floor was leased to Rymsbran pursuant to terms of the Lease.[2] Rymsbran then

---

1. Rymsbran filed a Chapter 11 bankruptcy petition on November 9, 1993.

2. The Lease originally was entered into by Rymsbran, as landlord, and Ralph and Mahin Aryeh,

subleased the first floor to approximately sixteen commercial tenants including restaurants and retail businesses.

The Lease had a term of 999 years, with rent of $1 for the entire term. Rymsbran, as tenant, was also obligated to pay the water and sewer charges and the real estate taxes pertaining to the commercial portion of the building. Under Article 15 of the Lease, any failure by Rymsbran to make such payments would constitute a default under, but could not result in termination of, the Lease.

In connection with its renovations, Euclid proceeded to erect scaffolding and sidewalk bridges around the exterior of the building. Under Article 36 of the Lease, scaffolding and sidewalk bridges could not be erected in connection with any renovations for a period in excess of three months in any 36–month period. In its Complaint, Rymsbran alleges that scaffolding was erected on the 86th Street side of the building in February 1993 and not removed therefrom until May 1, 1994. The Complaint also states that on July 20, 1993, scaffolding and sidewalk bridges were erected on the property on 85th Street, 86th Street and along Broadway. All scaffolding was removed by September 14, 1994.

Rymsbran's Complaint further asserts that since July 1993, as a result of the renovations performed by defendants or their agents and the erection of the scaffolding, major interruptions to and interferences with commercial subtenants have occurred, including extensive water damage, cold air infiltration, infestation by vermin, inadequate lighting under sidewalk bridges, unsafe and inconvenient conditions due to debris, loss of inventory due to water damage, incessant dust, and a general decrease in business. Rymsbran claims that these problems caused it to be unable to collect full rents from its subtenants and that certain subtenants threatened to quit the premises.

Appellants were required to serve an answer to these claims by April 6, 1994 but failed to do so until April 18, 1994. Then, on April 27, 1994, Appellants' counsel failed to attend a scheduled pretrial conference.

Judge Holland granted Rymsbran's motion for default made on that date and directed Rymsbran to settle an order and judgment against Appellants in the amount of $500,000. After a hearing held on June 15, 1994 at which Appellants explained that their failure to attend was the result of their not realizing that the summons they had received contained notice of the meeting, the Bankruptcy Court vacated the default and ordered Appellants to pay Rymsbran's fees relating thereto. That order also deemed Appellants' answer to the complaint to have been timely filed.

On July 11, 1994, Appellants filed a motion to dismiss the complaint alleging that as a lease, the Lease had to have been assumed or rejected by Rymsbran within 60 days of the time set by the Bankruptcy Court or be deemed automatically rejected. As Rymsbran had not assumed the Lease within the allotted time, Appellants argued that the Lease should be deemed rejected pursuant to 11 U.S.C. §§ 365(d)(3) and 365(d)(4).

In its motion to dismiss, Appellants also claimed that West Side was not a proper party to the suit. Appellants noted that West Side was neither a party to the Lease nor to the construction agreement with Sparrow Construction Corporation, the general contractor for the renovation work. Moreover, Appellants asserted that West Side had not performed any of the acts alleged by Rymsbran to be negligent. The renovation work was supposedly only the responsibility of Euclid, Sparrow Construction Corporation and its subcontractors. Accordingly, Appellants argued, the suit against West Side should be dismissed.

At a hearing held on August 3, 1994, Judge Holland denied Appellants' motion to dismiss for Rymsbran's failure timely to assume the Lease and held in abeyance pending further discovery Appellants' motion to dismiss West Side as an improper party. Judge Holland then scheduled a pretrial conference for September 21, 1994. If an appeal from the denial of the motion were pending, however,

---

Rymsbran's two sole shareholders, as tenants. On April 24, 1990, the date on which the Euclid Hall Hotel was transferred to Euclid, Rymsbran assigned its interest as landlord under the Lease to Euclid and the Aryehs assigned their interest as tenants under the Lease to Rymsbran.

Judge Holland indicated that the proceeding would be adjourned *sine die* and the pretrial conference would not take place.

In the meantime, Rymsbran had served Euclid and West Side with discovery demands consisting of interrogatories and a request for document production. Because the original schedule for the discovery interfered with the vacation plans of Appellants' staff, Rymsbran granted Euclid and West Side a three-week extension until September 16, 1994 to comply with the discovery demand. Euclid and West Side failed to comply with the discovery request by that date.

Seklir also failed to appear at the September 21, 1994 pretrial conference, allegedly because Appellants intended to appeal the denial of its motion to dismiss. No appeal was, however, pending on the date the conference was scheduled because the order from which an appeal could be taken had not yet been finalized.

Based on Seklir's failure to appear at the September 21 conference and on Rymsbran's assertion that Euclid and West Side had also failed to meet the discovery schedule, Judge Holland for the second time granted Rymsbran's oral motion for a default judgment and directed Rymsbran to settle an order for entry thereof.

On October 13, 1994, Appellants moved by order to show cause to vacate the order entering a default. Seklir represented to the Bankruptcy Court that he had not thought that the September 21 conference would occur since Appellants intended to appeal the denial of their prior motion to dismiss and the Bankruptcy Court had indicated that the conference would be adjourned if an appeal were pending. Seklir stated that he had attempted to call Judge Holland's chambers one hour prior to the conference time to confirm that no conference would be held but was unable to get through on the line. Because he was on trial that day in another court, Seklir did not attempt again to call the Bankruptcy Court. He apologized for his error and offered to pay Rymsbran's costs and attorney's fees.

Seklir also argued that Appellants had a meritorious defense in that Rymsbran had been "less than diligent in enforcing its leases with its tenants." (Aff. in Support of Order to Vacate Default at 6.) Seklir also noted that the reason Euclid and West Side had failed to comply with the discovery demand was "the extent to the demands, the need to make copies of voluminous documents and the press of other business." *Id.* During the hearing on the motion to vacate held on October 19, 1994, Seklir also questioned what would have been accomplished had he appeared at the conference given that Appellants intended to appeal the denial of the motion to dismiss.

Rymsbran countered that since Appellants had not manifested any outward sign that they intended to file an appeal, Seklir should have assumed that the pre-trial conference would proceed as scheduled. Rymsbran noted that if Appellants really thought that the pretrial conference had been adjourned, they would not have placed a call into chambers. Rymsbran further asserted that Appellants' actions were delaying Rymsbran's planned reorganization.

During the October 19, 1994 hearing, the Bankruptcy Court focused on the importance to reorganization efforts of speedily resolving litigation involving the bankrupt party. Without determining whether Appellants acted intentionally in failing to appear at the September conference, Judge Holland denied the motion to vacate. In giving his reasons for the denial, Judge Holland described generally the prejudice to Rymsbran and to its creditors that could result from Appellants' actions:

> I can understand the first default, I can't understand the second one and while I am somewhat sympathetic to you, sir, and while I realize the drastic results that denying your application to set aside the default would entail, I can't permit what is either sloppy practice or shrewd practice and I'm not sure which and I'm not making the finding which but I can't permit the type of practice that caused two successive defaults in the same proceeding to delay the debtor, to delay the ultimate resolution of what creditor claims are going to be paid, to get ultimate creditor claims paid the maximum that we can get them paid,

to get them paid as soon as we can get them paid since the undersecured creditors claims are paid without interest. It seems to me that the prejudice not only to the debtor but to the unrepresented in this proceeding general creditor body [sic] is something that I can't overlook.

(Hearing Tr., October 19, 1994, at 4.) Judge Holland also noted the effect on his calendar of Appellants' actions:

Sir, how about the prejudice to me, I have some 3800 case [sic] assigned to me. I've been on this bench now for nine years. I now have a caseload roughly equal to the caseload that the entire district had when I started this job some nine years and one month ago ... I also manage to have a trial calendar so up to date that I could start your trial tomorrow morning if you were ready for trial today ... I can't cope with the volume of cases that I have if I don't have attorneys who comply with established rules and established procedures and I'm not going to let you drag the whole judicial process that I've spend nine years to try to build and support, I'm not going to let you destroy it in one case.

(*Id.* at 6–7.) Judge Holland concluded:

It is the old system of triage, the French system of triage and when the doctors are out in the battle field and they can't care for all of the dying and wounded, they give their limited resources to those where the resources are going to produce the maximum results and I can't waste more resources on this, sir, and I'm going to deny the application.

(*Id.* at 12.) In his oral ruling on October 19, 1994, Judge Holland also denied Appellants' motion to stay enforcement of the judgment pending appeal. On October 27, 1994, Judge Holland signed a default judgment in the amount of $500,000 against Appellants.

On November 7, 1994, Appellants, now represented by Paul, Weiss, Rifkind, Wharton & Garrison, filed a notice of appeal from the entry of the default judgment and moved for a stay pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure pending appeal of the default judgment. In a Memorandum and Order dated November 22, 1994, the Court granted the stay. On November 23, 1994, Appellants filed a second notice of appeal from the Bankruptcy Court's denial of the motion to vacate the default judgment.

### DISCUSSION

The standard for review in this appeal is whether the Bankruptcy Court abused its discretion in entering the default judgment against Appellants and in denying the motion to vacate the judgment. *Marziliano v. Heckler,* 728 F.2d 151, 155–56 (2d Cir.1984); *Davis v. Musler,* 713 F.2d 907, 913 (2d Cir.1983).

Appellants contend that the bankruptcy court erred both in entering a default judgment against them and in later refusing to vacate the judgment. Although "[a] trial court's determination in entering a default judgment is entitled to great deference," *In re Men's Sportswear, Inc.,* 834 F.2d 1134, 1138 (2d Cir.1987) (citing *Marziliano,* 728 F.2d at 156), the Second Circuit has emphasized that "[s]uch discretion is nonetheless not unlimited; we have reversed its exercise, even where the abuse was not glaring." *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993) (citing, among other cases, *Davis,* 713 F.2d at 913). "The circumscribed scope of the district court's discretion in the context of a default is a reflection of our oft-stated preference for resolving disputes on the merits." *Id.* (citations omitted); *see also Sony Corp. v. Elm State Electronics, Inc.,* 800 F.2d 317, 320 (2d Cir.1986) (citing *Gill v. Stolow,* 240 F.2d 669, 670 (2d Cir.1957) for the proposition that the Second Circuit strongly prefers resolution of disputes on their merits); *Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir.1981) ("doubts are to be resolved in favor of a trial on the merits"). Upon a careful review of the record, the Court finds that although the Bankruptcy Court's initial entering of the default against Appellants may have been justified given the broad discretionary power generally afforded to a trial court in such cases and the lack of explanation by Appellants at that time of their procedural errors, the Bankruptcy Court's later refusal to vacate the default judgment cannot be sustained.

■ Because Appellants moved to vacate the default after Judge Holland's entry thereof but prior to his signing of the default judgment on October 27, 1994, the motion to vacate is governed by Fed.R.Civ.P. 55(c) which provides that "[f]or good cause shown the court may set aside the entry of default ..." The Court of Appeals for the Second Circuit has established three criteria for determining whether entry of a default should be set aside for "good cause" under Rule 55(c): (a) whether the default was willful, (b) whether the moving party has presented a meritorious defense with respect to the underlying action and (c) whether setting aside the default would prejudice the party who secured the entry of default. *Enron Oil*, 10 F.3d at 96; *Meehan*, 652 F.2d at 277. The Second Circuit has emphasized the importance of having the court before which a motion to vacate is being argued explain its ruling within the framework of the foregoing criteria. *See Marziliano*, 728 F.2d at 156; *Davis*, 713 F.2d at 912.

In the case at bar, the Bankruptcy Court did not explain its ruling within this framework. In failing to do so, the Bankruptcy Court exceeded the scope of its discretion. Since application of the appropriate framework would have led to a different outcome, as shown below, the Bankruptcy Court's ruling must be reversed.

### A. *Willfulness*

■ Despite Appellants' detailed recitation of how their failure to appear at the pretrial conference was the result of a misunderstanding, the Bankruptcy Court explicitly declined to determine whether the default was willful or not. (*See* Tr., October 19, 1994, at 4.) This failure constituted an abuse of discretion on the part of the Bankruptcy Court, as a finding of willfulness is key in determining whether to vacate a default judgment.

Had the Bankruptcy Court appropriately considered the issue of wilfulness, it would have had to conclude, at least based on the present record, that Appellants were simply not recalcitrant parties who failed to comply with a court order in order to reap advantage. *See Eagle Associates v. Bank of Montreal*, 926 F.2d 1305, 1310 (2d Cir.1991). Although Seklir failed to appear for the pretrial conference scheduled for September 21, 1994, there is no indication on the record that the failure was intentional. To the contrary, defense counsel indicated that he had been confused as to whether the meeting would go forward. Although Seklir's failure to telephone the Bankruptcy Court to determine whether the conference would proceed was careless and irresponsible, it did not rise to the level of willfulness.

Appellants' failure to comply with Rymsbran's discovery request for interrogatory responses and document production is a more difficult issue to address, given the amount of time Appellants had to satisfy the request. Appellants' excuse, that they needed to make copies of voluminous documents and that other business was more pressing, is hardly adequate. At the very least, if Appellants had difficulty meeting discovery demands, they should have notified Rymsbran and the Bankruptcy Court in order to make appropriate adjustments to the schedule. It appears, however, that at the time Appellants were required to meet the discovery request, they were attempting to remove the scaffolding from the Euclid Hall Hotel. This effort exemplifies that Appellants were trying in good faith to address Rymsbran's concerns. As Seklir noted during the October 19, 1994 hearing on the motion to vacate the default, "[w]e are not as the debtor is claiming intentionally trying to delay this case. We took every step that we could to remove and to get the contractor to remove the scaffolding around the building. At this point the scaffolding has been down for several weeks." (Hearing Tr., October 19, 1994, at 6.) In light of Appellants' efforts to remove the scaffolding, the Court is unwilling to find a default entry justified based on their failure to comply with discovery. While Appellants and their counsel again acted inattentively, irresponsibly and negligently, the Court does not believe the record shows their actions to have been willful.

### B. *Meritorious Defenses*

The Bankruptcy Court also failed during the hearing on the motion to vacate the default entry to consider whether Appellants

had presented a meritorious defense with respect to Rymsbran's claims. As this is another important factor in ruling on whether to vacate a default entry and as Appellants in fact had presented a number of meritorious defenses, the Court must conclude that the Bankruptcy Court overextended its discretionary power in failing to vacate the default.

 A showing of a meritorious defense is made by demonstrating " 'that if relief is granted the outcome of the suit may be different than if the entry of default or the default judgment is allowed to stand.' " *In re Martin–Trigona*, 763 F.2d 503, 505 n. 2 (2d Cir.1985) (quoting 10 C. Wright, A. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2697, at 525 (2d Ed. 1983). A party seeking to vacate a default need not conclusively establish the validity of its defense but merely that the defense raises a serious question. *See Marziliano*, 728 F.2d at 156–57 (citing *Davis*, 713 F.2d at 916); *Bicicletas Windsor v. Bicycle Corp. of America*, 783 F.Supp. 781, 788 (S.D.N.Y.1992) (involving action brought under Fed.R.Civ.P. 60(b) where same standard as in a Rule 55(c) motion was applied); *Brown v. Defilippis*, 695 F.Supp. 1528, 1530 (S.D.N.Y.1988) (citing *Davis*, 713 F.2d at 916). In sum,

> [a] defendant seeking to vacate an entry of default must present some evidence beyond conclusory denials to support his defense.... The test of such a defense is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense.

*Enron Oil*, 10 F.3d at 98 (citations omitted).

Euclid and West Side have raised a number of meritorious defenses. In their July 11, 1994 motion to dismiss, Euclid and West Side argued that Rymsbran should have assumed the Lease under 11 U.S.C. §§ 365(d)(3) and 365(d)(4) within a specified time period and that the failure to do so constituted a deemed rejection of the Lease. In its opposition to the motion to dismiss, Rymsbran had argued that the Lease constituted a *de facto* common law condominium

arrangement rather than a *bona fide* lease and therefore did not fall within Sections 365(d)(3) and 365(d)(4). In support of this argument, Rymsbran pointed to the fact that the Lease does not provide for rental payments, does not permit termination upon Rymsbran's default, has essentially a perpetual term and does not provide for any affirmative obligations by either party.

Euclid and West Side responded that the Lease was a *bona fide* lease, albeit one very favorable to the tenant. Appellants argued that the Lease did contain affirmative obligations typical of a standard commercial landlord-tenant relationship, pointing, *inter alia*, to the landlord's obligation to maintain and repair the leased space under Article 9. Appellants further asserted that a common law condominium arrangement could not be found to exist since New York law only provides for statutory condominiums and a no action letter from the Attorney General of New York State allowing for an exception had not been obtained. Appellants also pointed to Article 41 of the Lease, which provides for conversion of the premises to a condominium, as an indication that the parties intended to create a lease arrangement.[3]

The Bankruptcy Court did not decide the motion to dismiss on the issue of whether the provisions of the Lease represented a *bona fide* lease arrangement. Rather, the Bankruptcy Court concluded that even if the Lease were a *bona fide* lease, forfeiture of a 999–year lease term the payment for which was only $1.00 was an extreme sanction for a mere failure to assume the Lease within the time period specified under 11 U.S.C. §§ 365(d)(3) and 365(d)(4). In this connection, Appellants attempted, but failed, to convince the Bankruptcy Court that viewing the payment for the 999–year lease term as being only $1.00 was inappropriate because the real estate taxes and water and sewer charges for which Rymsbran was responsible were the equivalent of rental payments.

The Bankruptcy Court also focused on Article 15 of the Lease which states that no default could divest Rymsbran of its lease-

---

**3.** In Rymsbran's favor, Article 41 also provides that "this Lease is intended to except and reserve

unto Tenant an interest in the [ ] Premises which is virtually identical to a fee ownership interest."

hold interest. At the August 3, 1994 hearing on Appellants' motion to dismiss, the Court stated to Seklir that it did not "see why your client should have a greater right with regard to the leasehold interest in a Chapter 11 proceeding than it would have without it. In the normal instance, the landlord or any creditor has fewer rights in a Chapter 11 proceeding than it would have had if the Chapter 11 proceeding had not been filed." (Hearing Tr., August 3, 1994, at 8.)

Appellants argue that, despite the denial of its motion to dismiss, the issue raised under 11 U.S.C. §§ 365(d)(3) and 365(d)(4) is a worthy one for which an appeal is merited. In denying the motion to dismiss, the Bankruptcy Court itself acknowledged that the issue was "a complicated one." (Hearing Tr., August 3, 1994, at 33.) Because the issue would constitute a complete defense to liability and, as the preceding discussion evidences, raises difficult questions under New York real property law and federal bankruptcy law for which considerable additional briefing on appeal would certainly be required, the Court concurs with Appellants that this defense is meritorious.

Appellant West Side has a further meritorious defense, that it is not a proper party to the action. Rymsbran argues that West Side managed the operation of the Euclid Hall Hotel and supervised the construction project at the property during the period for which liability is asserted. Rymsbran claims therefore, that West Side was responsible in tort under a negligence theory of liability. Rymsbran further claims that West Side's managerial responsibilities were extensive enough to establish that West Side acted as Euclid's alter ego and, presumably, is liable for breach of the Lease as well, even though West Side was not a party thereto.

Rymsbran, however, provides no support for its allegations, save responses to interrogatories indicating that "Euclid [ ] engaged [West Side] as managing agent and social service provider." In unsworn materials submitted to the Court, Rymsbran refers to an agreement between West Side and Euclid, dated December 13, 1993, placing West Side in charge of "the operation and management of the premises during the period covered by the Complaint." (Rymsbran Appeal Brief at 17.) Rymsbran fails, though, to submit a copy of this agreement for the Court's review. Without some sort of concrete evidence that West Side's role as managing agent included supervision of the construction, the Court is unwilling to find that West Side has no meritorious defense to its inclusion as a plaintiff under a tort law theory of liability. Questions of fact abound on this point.

Moreover, the fact that West Side and Euclid may have overlapping staff and directors does not, as Rymsbran seems to claim, in and of itself mean that West Side acted as an alter ego for Euclid and is therefore liable for breach of the Lease. Rather, the existence of overlapping staff and directors is only one factor to consider in determining whether a party acted as an alter ego for another. *See Passalcqua Builders v. Resnick Developers*, 933 F.2d 131, 139 (2d Cir.1991) (noting other factors to consider). Under New York law, piercing of the corporate veil is appropriate only when the corporate "form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979) (citations omitted); *see also Itel Containers v. Atlanttrafik Express Service Ltd.*, 909 F.2d 698, 703–04 (2d Cir.1990) (citations omitted); *Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir.1989) (quoting *Gartner*, 607 F.2d at 586). In applying this standard, a court must be mindful of the fact that New York courts are generally reluctant to disregard the corporate entity. *Wrigley*, 890 F.2d at 600 (citations omitted). In light of this stringent standard and the limited record before the Court, it is unclear whether or not the inclusion of West Side as a plaintiff on an alter ego theory could survive any summary judgment motion made by West Side.

The Court recognizes that both of the foregoing defenses were not raised specifically in Appellants' motion papers to the Bankruptcy

172

Court to vacate the default or at the October 19, 1994 hearing on the motion to vacate. The Court believes it is nevertheless appropriate to consider these defenses, as Judge Holland was more than well aware of these issues from discussions at earlier conferences before him.

Euclid presents as a third meritorious defense the claim that for public policy reasons, the Lease restrictions concerning scaffolding should not be enforced. Rymsbran argues that this defense was not presented in any of the proceedings before the Bankruptcy Court and that Euclid should therefore be barred from raising it on appeal. It is indeed "a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Greene v. United States,* 13 F.3d 577, 586 (2d Cir.1994) (citations omitted). However,

> [t]his rule is not an absolute bar to raising new issues on appeal; the general rule is disregarded when we think it necessary to remedy an obvious injustice ... We will also sometimes entertain arguments not raised in the trial court if the elements of the claim were fully set forth and there is not need for additional fact finding ... Entertaining issues raised for the first time on appeal is discretionary with the panel hearing the appeal.

*Id.; see also Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (citations omitted); *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 527 (2d Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990).

The record below does not contain the factual background necessary to assess the viability of the public policy argument raised by Appellants. For instance, the record contains no discussion of the local building ordinances of which the Euclid Hall Hotel, prior to any renovation work, was supposedly in violation. Nor does the record below reveal that the Bankruptcy Court was presented a history of the negotiations among Appellants, Rymsbran and the City of New York over the scaffolding provision. This missing factual information is relevant to determining whether the public policy defense is meritorious.

As no injustice will result from failure to consider the public policy defense, the Court declines to entertain argument on the issue. The Court has already found two of Appellants' defenses to be meritorious. Nothing would be gained by considering this additional basis for vacating the default judgment.

## C. Prejudice

The only aspect of the three-pronged test for determining whether to vacate a default judgment under Rule 55(c) that the Bankruptcy Court focused on was the prejudice to Rymsbran and its creditors. The Bankruptcy Court emphasized that Appellants' actions would postpone the "ultimate resolution" of which creditors were to be paid and what payments they would receive.

An examination of Rymsbran's Disclosure Statement Pursuant to Section 1125 of Bankruptcy Code, dated October 31, 1994 (the "Disclosure Statement"), is necessary to determine the degree of prejudice to Rymsbran or its creditors. The Disclosure Statement reveals that Rymsbran has slated any damages recovered from the suit against Euclid and West Side to pay due and unpaid real estate taxes and sewer, water and other charges owed to New York City and New York State. Rymsbran's Disclosure Statement further shows that until any recovery from the suit against Appellants, an amount of $9,500 would be paid monthly from other sources over a three-year period, with a balloon payment at the end thereof, to cover these unpaid charges and taxes. The Disclosure Statement also indicates that Rymsbran's general unsecured creditors are expected to receive only 20% of their claims, to be paid *pro rata* in 24 equal monthly payments beginning within 30 days of confirmation of the plan.

Although the Court is sympathetic to Rymsbran's efforts to offer its creditors a favorable reorganization plan, the Court concludes, based on the Disclosure Statement, that Appellants' failure to appear at a pretrial conference, a short-lived delay, and to answer discovery requests, a curable error, could not have prejudiced Rymsbran's creditors unduly. First, if time had indeed been

of the essence, preparation of the order necessary for appeal of the Bankruptcy Court's denial of Appellants' motion to dismiss would not have been as delayed as the record indicates. Second, Appellants had indicated their intent to appeal the denial of their motion to dismiss, making it questionable whether a judgment on the merits would have been handed down in time for the scheduled confirmation hearing. Finally, the long timetables that Rymsbran proposed in its Disclosure Statement for payments to public authorities and its general creditors indicate that Rymsbran did not view timeliness of payments to these creditors as being critical to acceptance of its reorganization plan.

■ Moreover, the Court notes that Rymsbran's claim of prejudice, rooted in the notion of delay, is typically not a basis for finding prejudice, absent risk of loss of evidence, an increased difficulty in obtaining discovery or a greater opportunity for fraud or collusion, none of which are present here. *See Davis,* 713 F.2d at 916; *Bicicletas Windsor,* 783 F.Supp. at 788; 10 Wright et al., *supra,* § 2699, at 537. Arguably, delay in and of itself in the bankruptcy context may be problematic since a bankrupt party's general unsecured creditors are not entitled to interest on any amounts they receive from the bankrupt party. Rymsbran's Disclosure Statement does not, however, indicate how, if at all, its general creditors would have benefited from a judgment against Appellants. Without any such indication of benefit, it is hard to conclude that Rymsbran's general creditors will be harmed by the delay in the proceedings against Appellants. Nor, as indicated previously, is it at all clear that vacating the default judgment would delay completion of Rymsbran's reorganization plan and thereby postpone commencement of the planned payments in respect of the general creditors' claims.

The Bankruptcy Court more general concern that Appellants' repeated procedural errors would continue, thus further delaying resolution of the suit and payment to creditors, could have been dealt with by less severe measures. The Bankruptcy Court had a myriad of sanctions from which to chose, including requiring Appellants' counsel to pay Rymsbran's costs and attorney's fees in connection with the default proceedings, *see, e.g., Bicicletas Windsor,* 783 F.Supp. at 788, or requiring Seklir to withdraw as counsel, as Seklir offered to do.

As another basis for finding prejudice, Rymsbran argues in its opposition to Appellants' appeal that Appellants' procedural delays have impacted on its ability to collect rent from its subtenants. Implicit in this assertion is that the renovations to the Euclid Hall Hotel continue to cause damage to Rymsbran's subtenants. Rymsbran has not, however, proffered evidence that its subtenants have been affected by any continuing construction. Certainly the scaffolding is not a problem any longer, as it was removed in September 1994. Accordingly, Rymsbran's assertion of continued prejudice in this regard is without support.

### D. *Other Factors*

■ The large money judgment against Appellants confirms the appropriateness of vacating the default. Defaults are generally disfavored in matters involving large sums of money. *See Enron Oil,* 10 F.3d at 97; *Sony Corp.,* 800 F.2d at 320 (citations omitted). In this case, not only is the amount of the judgment large but it is likely to have a particularly devastating effect on Appellants and on the community of people they serve. As charitable organizations working to provide housing and social services for New York City's homeless, Appellants claim to own and operate approximately 1,900 housing units for the elderly and poor, a portion of which is publicly funded or financed by private charitable contributions. Appellants stress that they have no endowment or cash reserves. Imposing the default judgment would, therefore, likely jeopardize the assistance these organizations provide to New York City's poor and elderly populations. Such a result, occurring without a trial on the merits, would hardly serve the public interest.

Although the Bankruptcy Court recognized the "drastic results" the default judgment could have (Hearing Tr., October 19, 1994, at 4), that court simply did not give them the

weight they deserved but instead, understandably but unjustifiably, emphasized the effect of Appellants' actions on the court's calendar. The Second Circuit has recognized a trial court's desire to dispose of cases on its docket but has stated that such a desire should not take precedence over achieving a just result.

> We recognize the tension that exists between the push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously, which cases delay and clog its calendar, on the one hand; and the strong pull on the same trial judge to do justice in the individual case, on the other hand. But an understandable zeal for a tidy, reduced calendar of cases should not overcome a court's duty to do justice in the particular case. It is the responsibility of the trial court to maintain a balance between clearing its calendar and affording litigants a reasonable chance to be heard.

*Enron Oil*, 10 F.3d at 95–96 (citations omitted). In the case at bar, given the considerable potential harm that the default judgment posed, the other measures available to the Bankruptcy Court for addressing Appellants' procedural errors and the good cause shown by Appellants for vacating the default, justice required giving Appellants another chance, whatever the perceived effect on the court's docket.

### CONCLUSION

Based on the foregoing, the Court vacates the default judgment against Euclid and West Side. The case is remanded to the Bankruptcy Court for preparation for trial and for determination of any monetary or other sanctions against Euclid and West Side or their former counsel that the Bankruptcy Court may deem appropriate relating to counsel's failure to appear at the pre-trial conference on September 23, 1994 and failure to comply with the discovery request.

SO ORDERED.